```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___8/8/16___
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
BRUCE YANCEWICZ, JR.,                                          :
                                                               :
                              Plaintiff,                       :
                                                               :     15-CV-4359 (VEC)
             -against-                                         :
                                                               :     MEMORANDUM
FREDERICK FAYO, DANIEL BREEN,                                  :     OPINION & ORDER
ALEXANDER RAGNI, HARDY PIERCE, "JOHN                           :
DOE," TOWN OF WINDSOR,                                         :
                                                               :
                              Defendants.                      :
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

Plaintiff Bruce Yancewicz, Jr. has asserted claims pursuant to 28 U.S.C. § 1983 against the Town of New Windsor and individual defendants Detective Daniel Breen, Sergeant Frederick Fayo, Officer Hardy Pierce, Officer Alexander Ragni, and one unidentified officer ("John Doe," and with the other individuals, "Defendants"). Specifically, Plaintiff has brought claims for unlawful entry, excessive force, failure to intervene, and deliberate medical indifference.[1] Now pending before the Court is Defendants' motion for summary judgment (the "Motion"). For the reasons set forth below, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

At the time of the events in this case, Plaintiff lived with his fiancée in an apartment in

---

[1] Pursuant to the parties' February 5, 2016, stipulation, Plaintiff dismissed with prejudice his first, second, and fifth causes of action alleging Eighth and Fourteenth Amendment violations and claims for lost wages under state law. Dkt. 19. Plaintiff also dismissed with prejudice all claims against Richard Hovey, in accordance with Fed. R. Civ. P. 41(a)(1)(A)(ii). *Id.* Plaintiff's cause of action brought pursuant to *Monell v. Dep't of Social Services of City of N.Y.*, 436 U.S. 658 (1978), has been stayed since July 19, 2015, pending disposition of Plaintiff's claims against the individual defendants. Accordingly, this order does not address Plaintiff's *Monell* claims against the Town of Windsor.

Orange County, NY.  Yancewicz Dep. Ex. P at 11:10-14; 96:8-97:2 (Dkt. 22-16).[2]  His fiancée's daughter, Angela Barnes, and Barnes' boyfriend, Travis Davis, also lived in the apartment.  Burke Aff. Ex. V, at 7:12-14, 18:17-20, 19:4-8 (Dkt. 22-22).  On the evening of July 16, 2014, Plaintiff and Davis got into an argument and physical altercation at the apartment.  Yancewicz Dep. Ex. P at 98:14-21.  Davis and Barnes called the police and reported the dispute, which the New Windsor Police noted as a report of an "unwanted person on the premises."  Burke Aff. Ex. R ("Pierce Dep."), at 8:12-1; Burke Aff. Ex. C, at 2.  The parties sharply dispute the events that followed.

## I.     The Police Response to the Call and Events Leading up to Plaintiff's Arrest

### A. Defendants' Account

According to Defendants, several officers, including Takeuchi, Breen, Fayo, and Pierce, were dispatched in response to Barnes' call between 7:29 p.m. and 8:02 p.m. and arrived at Plaintiff's apartment between 7:45 p.m. and 8:02 p.m.  Defs. 56.1 Stmt. ¶¶ 19-21; Burke Aff. Ex.C, at 1.[3]  When the officers arrived at the apartment, Barnes and Davis told them that Plaintiff was inside the apartment and told Officer Pierce that Plaintiff had an outstanding arrest warrant.  Defs. 56.1 Stmt. ¶ 23; Pierce Dep. at 9:11-13, 11:17-22, 12:17-13:5 (Dkt. 22-18).  According to Officer Pierce, one of the responding officers phoned New Windsor Police to confirm the arrest warrant.  Defs. 56.1 Stmt. ¶ 23; Pierce Dep. at 12:17-13:5.  Davis also told Officer Pierce that

---

[2]     The parties filed separate excerpts of Bruce Yancewicz Jr.'s deposition to support their submissions.  The Court refers to Defendants' excerpts of the Yancewicz Deposition (Burke Aff. Ex. P, Dkt. 22-16) as "Yancewicz Dep. Ex. P" and to Plaintiffs' excerpts of the Yancewicz Deposition (Giordano Aff. Ex. 3, Dkt. 30-3) as "Yancewicz Dep. Ex. 3."

[3]     The Court refers to Defendants' Statement Pursuant to Local Rule 56.1 (Dkt. 21) as "Defs. 56.1;" to Defendants' Memorandum of Law in Support of their Motion for Summary Judgment (Dkt. 22) as "Defs. Mem.;" to Plaintiff's Counter Statement Pursuant to Local Rule 56.1 (Dkt. 32) as "Pl. 56.1 Stmt.;" to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Dkt. 31) as "Pl. Opp."; and to Defendants' Reply Memorandum of Law in Further Support of their Motion for Summary Judgment (Dkt. 40) as "Defs. Reply."

Plaintiff had been "acting kind of crazy." Defs. 56.1 Stmt. ¶ 29; Pierce Dep. at 9:13-20. Shortly thereafter, Barnes told Officer Pierce to go into the apartment. Defs. 56.1 Stmt. ¶ 28. Multiple officers entered the apartment and, after a brief search of the common area and Plaintiff's bedroom, concluded that Plaintiff was not present. Pierce Dep. at 9:24-10:3, 10:5-11:4; Burke Aff. Ex. T ("Takeuchi Dep."), at 6:14-16, 6:23-7:11 (Dkt. 22-20). The police dispersed and continued to search the area for Plaintiff. Pierce Dep. at 13:9-15, 15:14-16.

After leaving Plaintiff's apartment, Officer Takeuchi proceeded to surveil the nearby New Windsor Motel from his patrol vehicle in the parking lot. Takeuchi Dep. at 16:21-17:18. At approximately 8:30 p.m., he saw Plaintiff exit a taxi and enter a room at the New Windsor. *Id.* at 17:6-18. Officer Takeuchi radioed Officers Pierce and Ragni, Detective Breen, and Sergeant Fayo, alerting them to Plaintiff's location at the motel. The officers arrived shortly thereafter to arrest Plaintiff pursuant to the confirmed warrant.[4] Burke Aff. Ex. Q ("Fayo Dep.") at 57:11-59:11, 60:16-20 (Dkt. 22-17); Burke Aff. Ex. S ("Ragni Dep.") at 11:18-23 (Dkt. 22-19); Pierce Dep. at 14:24-15:11, 15:22-16:13; Burke Aff. Ex. U. ("Breen Dep."), at 12:6-8 (Dkt. 22-21). Upon confirming with the motel office that Plaintiff had rented room #34, Detective Breen obtained an electronic key from the staff for the room. Breen Dep. at 13:8-17.

### B. Plaintiff's Account

Plaintiff left his apartment around 6:30 p.m. on July 16, 2014, after an oral and minor physical dispute with Davis. Yancewicz Dep. Ex. 3 at 114:14-22. Plaintiff traveled with a friend to rent a room at the New Windsor Motel. *Id.* at 119:14-19. Afterwards, Plaintiff and his friend

---

[4] Although none of the responding officers documented the time he arrived at the motel, *see* Fayo Dep. at 60:23-25, the Defendants testified that the entire exchange with Plaintiff at the motel concluding in his arrest spanned about two minutes. *Id.* at 26:6-16; Ragni Dep. at 33:4-11. The arrest report notes the time of arrest as 8:35 p.m, Burke Aff. Ex. D, and the automatic reports from the officers' Tasers shows that the Tasers were deployed a total of nine times, all between 8:28 p.m. and 8:30 p.m. Burke Aff. Exs. H, I.

went to a deli, and then Plaintiff took a taxi to the motel at approximately 7:40 p.m. *Id.* at 122:10-123:24.

Although he left the apartment before the police arrived, Plaintiff maintains that neither Barnes nor Davis told the responding officers that there was an outstanding warrant for his arrest. Pl. 56.1 Stmt. ¶ 101; Giordano Aff. Ex. 8 ("Barnes Dep.") ¶ 9 (Dkt. 30-8). Barnes claims that neither she nor Davis even knew that Plaintiff had an outstanding arrest warrant at the time the officers responded to her call. Barnes Dep. ¶ 9. Plaintiff also disputes that Barnes or Davis permitted the officers to enter the apartment, Barnes Dep. ¶ 5; he asserts that the officers entered the apartment without permission and without a valid warrant, kicking down Plaintiff's bedroom door in an attempt to locate him, Pl. Opp. at 14; Barnes Dep. ¶ 8. Barnes asserts that neither she nor Davis told the responding officers that Plaintiff had "been acting kind of crazy." Barnes Dep. ¶ 9. According to Barnes, Plaintiff had no injuries when she last saw him, and he did not appear to be under the influence of any drugs. *Id.*

## II.     The Arrest at the New Windsor Motel and Plaintiff's Detention and Medical Treatment

### A. Defendants' Account

According to Defendants, Sergeant Fayo banged on Plaintiff's motel room door and made several announcements identifying himself as a New Windsor police officer with a warrant for Plaintiff's arrest. Defs. 56.1 Stmt. ¶ 47; Fayo Dep. at 31:18-24, 33:5-8. Sergeant Fayo, Detective Breen, and Officer Ragni eventually forced the door open against Plaintiff's resistance. Breen Dep. at 18:6-10, 18:15-21. Defendants assert Plaintiff looked "disheveled and sloppy," appeared "under the influence of something," and was "mumbling and not making any sense." Defs. 56.1 Stmt. ¶¶ 57-58; Breen Dep. at 18:6-10, 19:23-20:11, 20:25-21:9. Plaintiff also appeared to be bleeding from one or both of his arms. Burke Aff. Ex. E at 2. As soon as the

officers approached Plaintiff, he swung his arms and kicked towards them.  Defs. 56.1 Stmt. ¶ 56; Breen Dep. at 18:21-25.  After realizing that Plaintiff was violent and uncooperative, Officer Ragni tased him twice, but the Taser had "no effect" on the 6-foot 6-inch, 275-pound Plaintiff, who continued to kick and swing before lunging at Officer Ragni.  Defs. 56.1 Stmt. ¶¶ 63-65; Ragni Dep. at 15:21-16:6, 16:9-17:23, 18:2-12.

At some point during the commotion, Officer Pierce knocked on the door, and Officer Ragni opened it.  Defs. 56.1 Stmt. ¶ 66; Ragni Dep. at 19:3-20:3; Pierce Dep. at 27:5-24.  Officer Pierce saw Plaintiff try to grab the Taser from Officer Ragni, so he hit Plaintiff's hand with his baton.  Defs. 56.1 Stmt. ¶ 70; Pierce Dep. 37:15-38:3, 38:10-24; Ragni Dep. 20:11-20, 21:3-6.  Officer Pierce was the only officer with a baton, and the only time Officer Ragni saw Officer Pierce use the baton was in that moment, to prevent Plaintiff from grabbing the Taser.  Defs. 56.1 Stmt. ¶¶ 70-71; Ragni Dep. at 21:3-6, 23:5-7, 27:11-25; Fayo Dep. at 44:13-15, 85:17-23; Breen Dep. at 39:5-12.  The Defendants grabbed Plaintiff's arms and tried to move him away from the wall to the center of the room, where they could put his arms behind his back and handcuff him, but Plaintiff continued to resist.  Defs. 56.1 Stmt. ¶¶ 72, 75; Ragni Dep. at 23:8-25:3.

Once Plaintiff was brought to the center of the room, Detective Breen used his Taser to stun Plaintiff in the back of his calf to subdue him enough to handcuff him.  Defs. 56.1 Stmt. ¶¶ 74, 75; Breen Dep. at 28:14-29:22.  Again, the Taser had no effect on Plaintiff.  Defs. 56.1 Stmt. ¶ 77; Breen Dep. at 40:9-13; Fayo Dep. at 39:9-40:2, 40:8-10, 71:6-14.  While Officer Pierce attempted to handcuff Plaintiff, Plaintiff kicked out at him, so Officer Pierce struck Plaintiff in the leg with a baton.  Defs. 56.1 Stmt. ¶ 81; Pierce Dep. 33:25-34:13, 37:2-14.  Sergeant Fayo and Detective Breen testified in their depositions that they each saw Officer

Pierce strike Plaintiff once or twice in the leg. Defs. 56.1 Stmt. ¶ 82; Fayo Dep. at 46:13-21, 84:4-12; Breen Dep. at 40:17-25. Approximately two minutes after the Defendants entered the motel room, they were able to handcuff Plaintiff to move him to the police car for transport to the New Windsor Police Station. Defs. 56.1 Stmt. ¶¶ 86-87; Fayo Dep. at 26:6-16, 71:12-16; Pierce Dep. at 45:13-17; Ragni Dep. at 27:8-10, 33: 4-11. The usage report automatically generated by Defendants' Tasers shows that two Tasers assigned to Detective Breen and Officer Ragni, respectively, were collectively deployed nine times in slightly less than two minutes. Burke Aff. Ex. H. Defendants also recovered from the motel room a pipe used for smoking crack cocaine that contained visible cocaine residue. Fayo Dep. at 42:20-25; Burke Aff. Ex. N.

Once at the police station, Plaintiff was held in custody awaiting an ambulance, which arrived at the station at 9:00 p.m. Defs. 56.1 Stmt. ¶ 89; Burke Aff. Exs. C, L at 4; Fayo Dep. at 53:8-54. Following an evaluation by an EMT at the police station, Plaintiff was transported to St. Luke's Cornwall Hospital at 9:40 p.m. Burke Aff., Ex. L at 4. At the hospital, Plaintiff received treatment for a laceration to his forearm, multiple "minor" wounds, and contusions to his forearm and knee. *See* Burke Aff. Ex. M. Defendants also adduce evidence that during his intake examinations at the hospital, Plaintiff admitted to drug use, including a "line of coke." Burke Aff. Exs. L at 2, M at 3.

### B. Plaintiff's Account

Plaintiff contends that he was eating a sandwich in his motel room when someone began banging on the door in an attempt to enter, without identifying himself. Yancewicz Dep. Ex. P at 130:24-131:8, 132:2-133:5, 136:8-14, 137:4-138:8, 139:21-140:3. Plaintiff looked through the peephole and saw multiple individuals, none of whom he recognized as police officers or people he knew. *Id.* at 138:13-139:24. Plaintiff then secured the door with the chain lock, fearing the

individuals outside were coming to retaliate on behalf of Davis, who is a former United States Marine. *Id.* at 139:5-140:3, 141:2-6, 287:24-288:4. After unlocking the door with the electronic key, one of the Defendants cut the chain lock with a pair of bolt cutters and forced the door open, hitting Plaintiff and knocking him backwards into a desk. Yancewicz Dep. Ex. 3 at 141:2-6, 146:2-11. At this point, all the Defendants rushed into the room. *Id.* at 177:2-6. Immediately, Officer Pierce swung the bolt cutter at Plaintiff's head, and Plaintiff held up his right arm to shield himself. *Id.* at 181:15-182:8. The force of the blow knocked Plaintiff to the ground, and the bolt cutter created a "big hole" in Plaintiff's forearm and a "hole" in his head. *Id.* at 176:10-178:24. Plaintiff tried to stand but was dealt repeated baton blows "all over" his body by all of the Defendants. *Id.* at 190:3-18. Then, Plaintiff was tased in the chest, and a "hot flash" ran through his body as Defendants continued to beat his legs with batons. *Id.* at 190:14-23. Plaintiff alleges he saw white flashes as he drifted in and out of consciousness, and that he soiled himself due to lack of physical control. *Id.* at 194:22-195:12, 203:5-10.

      Plaintiff asserts that he crawled into a ball, apologized, begged the officers to stop, and never fought back. *Id.* at 196:19-197:23. Plaintiff estimates that he was tased between fifteen and twenty times and recalls that he felt "like a . . . fish" who could not stand, despite repeated orders to do so by Defendants. *Id.* at 207:12-208:12, 209:15-16. Finally, Plaintiff was dragged to the center of the room by his hair, and his arms were held out to his sides so that Officer Pierce could hit him squarely in the chest with the bolt cutters. Pl. 56.1 Stmt. ¶ 37; Yancewicz Dep. Ex. 3 at 199:2-20, 216:23-25, 217:2-13. Plaintiff alleges that during the entirety of the exchange, Defendants never once identified themselves as police nor announced that they had a warrant for his arrest. *Id.* at 183:21-25, 190:1-3. According to Plaintiff, each of the Defendants participated in the beating. *Id.* at 209:2-3, 226:15-17.

Defendants eventually stood Plaintiff up, and Plaintiff felt a painful piercing sensation in his underarm, as if he had been jabbed with a metal prong or handcuffs. *Id.* at 223:5-21. Defendants then moved Plaintiff to a vehicle for transport to the police precinct. *Id.* at 205:16-25, 223:5-17. As they walked to the vehicle, Plaintiff asked to be taken to the hospital. *Id.* at 223:15-21. Plaintiff was taken directly to the police station, where he claims he continued to ask for medical treatment, only to be ignored or reprimanded by Defendants. *Id.* at 246:4-12. At the station, one or more Defendants directed Plaintiff to "clean up" and rinse his wounds in a sink so they could photograph him. *Id.* at 323:2-14. Photographs of Plaintiff at the police precinct show him in bloodied clothing, with a gash to his forearm and multiple Taser marks on his chest, stomach, and back. *See* Giordano Aff. Exs. 11, 12, 22, 25, 26. After Plaintiff was photographed, and nearly an hour after the initial arrest, an EMT examined Plaintiff and told police officers to take Plaintiff to the hospital. *Id.* at 245:13-22; Pl. 56.1 Stmt. ¶¶ 86-87. About forty-five minutes later, Plaintiff was transported by ambulance to the St. Luke's Cornwall Hospital, where he received treatment, including stitches on his arm, for his injuries. Yancewicz Dep. Ex. P at 252:14-25, 253:4-8, 254:2-4; Yancewicz Dep. Ex. 3 at 280:25-281:8.

## DISCUSSION

### I. The Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine dispute as to any material fact, and the Court must "resolve all ambiguities, and draw all inferences, against the moving party." *Sista v. CDC Ixis N. America, Inc.,* 445 F.3d 161, 169 (2d Cir. 2006) (citing *United States v. Diebold,*

8

*Inc.*, 369 U.S. 654, 655 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987)). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts," and "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citations and internal quotation marks omitted). Rather, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Sista*, 445 F.3d at 169 (citation omitted). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a motion for summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiff's Unlawful Entry Claim

Plaintiff alleges that Defendants Sergeant Fayo and Officer Pierce unlawfully entered his apartment.[5] Defendants argue that there is no material dispute of fact that they entered the apartment lawfully because they had Barnes' consent and had confirmed a valid arrest warrant for Plaintiff. Defs. 56.1 ¶ 11; Defs. Mem. at 3. Plaintiff denies both that Barnes consented to the Officers' entry and that the Officers knew of the warrant prior to entering the apartment. Pl. Opp. at 11-12.

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). "The prohibition does not apply . . . to situations in which voluntary consent has been obtained from the individual whose property is searched or from a third party who

---

[5] In his Complaint, Plaintiff's claim is more limited; Plaintiff only alleges that Defendants unlawfully entered his "room." Compl. ¶ 62 (Dkt. 1). Nevertheless, the Court considers Plaintiff's claim to include whether Defendants lawfully entered the apartment. In contrast, although Plaintiff argues in his opposition to Defendants' Motion that Defendants unlawfully entered his motel room, Plaintiff did not raise this claim in his Complaint, and thus the Court does not consider Plaintiff to have pled a claim for unlawful entry into the motel room.

possesses common authority over the premises." *Id.* at 181 (citations omitted). The authority for a third party to give consent to search rests "on mutual use of the property by persons generally having joint access or control for most purposes," *United States v. Matlock*, 415 U.S. 164, 172 n.7 (1974), such that the third party "(1) has access to the area searched and (2) has either (a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access to the area," *Moore v. Andreno*, 505 F.3d 203, 209 (2d Cir. 2007). "Even if the third party providing consent in fact lacked such authority, apparent authority can 'nonetheless validate the search if the person reasonably appeared to the police to possess authority to consent to the search.'" *United States v. Turner*, 23 F. Supp. 3d 290, 304 (S.D.N.Y. 2014) (quoting *United States v. McGee*, 564 F.3d 136, 139 (2d Cir.2009)), *appeal withdrawn* (Aug. 25, 2014).

Alternatively, "[a]gents may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant where a reasonable belief exists that the suspect is present." *United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995); *see also Payton v. New York*, 445 U.S. 573, 603 (1980) ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."). In these circumstances, entry does not require authorization by consent or search warrant. *See United States v. Bohannon*, No. 14-4679-CR, 2016 WL 3067993, at *5 (2d Cir. May 31, 2016).

Whether Defendants had consent to enter the apartment is a disputed question of material fact. Plaintiff relies on an affidavit from Angela Barnes to support his claim that no one consented to the officers entering the apartment. Barnes Dep. ¶ 9. While there was no written

consent to search, Defendants assert they were given oral consent by Angela Barnes to enter the apartment. Defs. 56.1 Stmt. ¶ 23; Pierce Dep. at 11:17-22, 12:17-13:5.[6]

In addition to the question of fact regarding the existence of consent, there is also a question of fact whether Defendants knew there was an outstanding arrest warrant for Plaintiff when they entered the apartment. Plaintiff argues that Defendants had no knowledge of an arrest warrant at the time they entered his apartment and that no valid arrest warrant for him may have even existed at the time he was arrested. Pl. Opp. at 12, 14. According to Plaintiff, neither Barnes nor Davis knew that there was an outstanding arrest warrant for Plaintiff and therefore could not have told the responding officers that a warrant existed. Pl. 56.1 Stmt. ¶ 101; Barnes Dep. at ¶ 9. Additionally, the police did not have a physical copy of the arrest warrant with them at any time on July 16, 2014. Pl. 56.1 Stmt. ¶ 100; Fayo Dep. at 32:11-25. Plaintiff's theory is that the officers did not conduct a warrant check until after they had arrested him at the motel. Pl. Opp. at 14. As evidence, Plaintiff offers the timestamps on both the blotter report and the Town of Montgomery police report. Pl. Opp. at 13. The reports reflect that the officers conducted a warrant check, but in the fields marked "Time," the entered values are 8:30 p.m. on the New Windsor blotter report and 10:50 p.m. on the Town of Montgomery police report, which are both after Defendants entered Plaintiff's apartment at around 7:30 p.m. Giordano Aff. Exs. 6, 7.

In contrast, Defendants assert that before any officer entered the apartment, Barnes and Davis informed Officer Pierce that there was an outstanding arrest warrant for Plaintiff and that

---

[6] Because the Court finds that there is a material factual dispute regarding whether Angela Barnes gave consent to enter the apartment, and accordingly denies summary judgment on Plaintiff's unlawful entry claim, the Court need not address the separate issue of consent regarding Plaintiff's bedroom. Whether Barnes had the authority or apparent authority to consent to the officers' search of the Plaintiff's bedroom specifically would depend on the factors outlined *supra*. *See Moore v. Andreno*, 505 F.3d 209.

Plaintiff was inside the apartment. Defs. 56.1 Stmt. ¶ 23; Pierce Dep. at 11:17-22, 12:17-13:5. One of the responding officers then immediately phoned the New Windsor Police dispatch, which confirmed the existence of the warrant out of the Town of Montgomery. Pierce Dep. at 12:17-13:5. Defendants adduce abundant evidence that a valid arrest warrant for Plaintiff existed at the time of the arrest. Burke Aff. Ex. F; Torre Aff. Ex. A. Further, Defendants explain that blotter reports are not made contemporaneously but rather after the relevant incident, and therefore the "Time" field does not necessarily reflect the actual time of the warrant check. Def. Reply at 5.

While Defendants offer evidence consistent with their narrative that the warrant was confirmed prior to their entry into Plaintiff's apartment, there is insufficient basis to conclude that there is no genuine dispute of material fact as to when Defendants learned of the arrest warrant. The parties present conflicting evidence whether Barnes informed the responding officers about the arrest warrant, which, according to Defendants, prompted the warrant check before entry into the apartment. Defendants also fail to offer any evidence demonstrating the time at which they conducted the warrant check. Given that all ambiguities and factual inferences must be construed in Plaintiff's favor as the nonmoving party, the Court finds that whether Defendants learned of the arrest warrant prior to entering Plaintiff's apartment is a disputed fact. Summary judgment is therefore denied with regard to Plaintiff's unlawful entry claim.

### III.     Defendants Are Not Entitled to Qualified Immunity on Plaintiff's Unlawful Entry Claim

Curiously, Defendants argue that even if the entry was unlawful, they are entitled to qualified immunity. Summary judgment on grounds of qualified immunity is appropriate "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such

that, even when it is viewed in the light most favorable to the plaintiff and with all permissible inferences drawn in his favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.'" *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (quoting *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996)); *see also Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

Viewing the facts in the light most favorable to Plaintiff, *see Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (citing *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)); *Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 576 (S.D.N.Y. 2002), the Court finds that a rational jury could conclude that Defendants' actions were objectively unreasonable. Here, there are facts in dispute that are material to a determination of the reasonableness of the officers' conduct. *Thomas*, 165 F.3d at 143; *see also Lennon*, 66 F.3d at 420 (noting that when the factual record is in dispute, courts need not resolve the question of whether officers acted objectively reasonably for purposes of qualified immunity). If the jury credits Plaintiff's version of events, the responding officers did not have consent to enter the apartment, were never told of a warrant, and did not know that one existed when they entered the apartment. Because it is clearly established law that the police cannot enter premises under those circumstances, it is hard to see how a jury could conclude both that the Defendants are liable (i.e., they credit Plaintiff's version of what happened) and that the police reasonably believed that their actions were not unlawful.[7] In short, Defendants are not entitled to summary judgment on their claim of qualified immunity.

---

[7] In its recent decision in *Utah v. Strieff*, the Supreme Court held that the discovery of a valid pre-existing arrest warrant between an unlawful stop and a search incident to arrest resulting in the seizure of evidence attenuated the connection between the unlawful stop and the search so that the evidence need not be suppressed. *See* 136 S. Ct. 2056, 2063 (2016). In that decision, the Supreme Court explicitly reserved judgment regarding whether the existence of a warrant alone makes a stop lawful even when the officer conducting the stop is unaware of the

## IV. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiff's Excessive Force Claim

"The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under the Amendment's 'reasonableness' standard." *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The reasonableness standard asks whether officers' actions were objectively reasonable "in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (internal quotations and citation omitted). This inquiry hinges on several factors, including "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Figueroa v. Mazza*, No. 14-4116-CV, 2016 WL 3126772, at *11 (2d Cir. June 3, 2016) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251-52 (2d Cir. 2001)). While "not every push or shove" permits a Fourth Amendment claim to survive summary judgment, bruising and other nonpermanent injuries may be sufficient to show excessive force if the reasonableness test is not met. *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004).

There are clearly questions of fact in this case whether the officers used excessive force to effectuate the arrest. In the first instance, the factual issue of whether, and to what extent, a

---

warrant's existence. *Id.* at 2062. Here, Defendants do not argue that the Court should resolve this open issue, and the Court declines to do so *sua sponte*, particularly in light of the concerns raised in Justice Sotomayor's dissent. *Id.* at 2067 (Sotomayor, J., dissenting) (expressing alarm at this "remarkable proposition: The mere existence of a warrant not only gives an officer legal cause to arrest and search a person, it also forgives an officer who, with no knowledge of the warrant at all, unlawfully stops that person on a whim or hunch.").

need for force existed hinges on the degree to which Plaintiff presented a threat to the arresting officers.  This finding is central to the reasonableness inquiry that is at the heart of an excessive force claim.  *See, e.g.*, *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124 (2d Cir. 2004) ("Because a reasonable jury could . . . find that the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances . . . the determination as to the objective reasonableness of the force used must be made by a jury following a trial."). According to Plaintiff, he never fought the arresting officers, assumed an entirely defensive position throughout the exchange, and would have complied with their requests but for the force used against him.  Yancewicz Dep. Ex. 3 at 196:19-197:23.  Defendants, on the other hand, claim that Plaintiff repeatedly reached for their weapons, kicked and swung at them, resisted their orders, and had no physical reaction to initially-low levels of force used against him.  Defs. 56.1 Stmt. ¶¶ 56, 63, 65, 70; Ragni Dep. at 15:21-16:6, 16:9-24; Piece Dep. 37:15-38:3, 38:10-24.

      Second, the amount of forced that was actually deployed is in dispute.  Plaintiff alleges that all four arresting officers participated in the beating with batons or bolt cutters and Tasers, striking several parts of Plaintiff's body in excess of fifteen times.  Yancewicz Dep. Ex. 3 at 209:2-3, 226:15-17.  Defendants, on the other hand, claim that only Pierce had a baton and used it, at most, three times.  Defs. 56.1 Stmt. ¶¶ 70-71, 82; Fayo Dep. at 44:13-15, 46:13-21, 84:4-12, 85:17-23; Breen Dep. at 39:5-12, 40:17-25; Ragni Dep. at 21:3-6, 23:5-7, 27:11-19.  Further, Defendants claim that only two officers had Tasers and that they only deployed them a few times to no effect on Plaintiff.  Defs. 56.1 Stmt. ¶ 77; Breen Dep. at 40:9-13; Fayo Dep. at 39: 9-40:2, 40:8-10, 71:6-14; Burke Aff. Ex. H.  Finally, the source of Plaintiff's injuries is disputed; Plaintiff claims Defendants cause his lacerations and bruises, while Defendants claim they found

15

Plaintiff with those injuries. Burke Aff. Ex. E at 2. Given these disputed facts, summary judgment is denied with regard to Plaintiff's excessive force claim.

### V. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiff's Failure to Intervene Claim

"Excessive force claims can be brought both against the perpetrating officer and against officers who are 'present during the assault, yet fail to intercede on behalf of the victim even though they had a reasonable opportunity to do so.'" *Johnson v. City of New York,* No. 05–CV–2357 (SHS), 2006 WL 2354815 at *6 (S.D.N.Y. Aug. 14, 2006) (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003)). "Where the record does not disclose an underlying excessive force violation, and does not suggest that an officer who observed the disputed incident could have been aware of the use of excessive force, summary judgment on a duty to intercede claim is appropriate." *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 600 (S.D.N.Y. 2013). Summary judgment is inappropriate, however, when there are genuine disputes of material fact "concerning what the officers who failed to intervene observed regarding the other officers' alleged violations of plaintiffs' constitutional rights." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012).

Because the parties dispute the extent to which force was used against Plaintiff during the arrest and the need for such force, the question of whether Defendants observed such force and failed to intervene is also necessarily in dispute. Accordingly, Defendants' motion for summary judgment on Plaintiff's failure to intervene claim is denied.

### VI. Defendants Are Not Entitled to Qualified Immunity for Plaintiff's Excessive Force and Failure to Intervene Claims

Defendants also seek summary judgment on Plaintiff's excessive force and failure to intervene claims on the ground of qualified immunity. Even if their actions are found to have constituted unreasonable or excessive force, Defendants would be entitled to qualified immunity

if, at the time they tased and used batons against Plaintiff, "the law . . . did not clearly establish that the officer[s'] conduct would violate the Constitution." *Brosseau v. Haugen*, 543 U.S. 194 (2004).

The right to be free from excessive force under the Fourth Amendment is clearly established. *See Maxwell*, 380 F.3d at 108. No reasonable officer could have believed that he was constitutionally entitled gratuitously to tase or beat a passive, unresisting arrestee who poses no threat to others. *See Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 296-97 (S.D.N.Y. 2014), *aff'd in part, dismissed in part sub nom. Garcia v. Sistarenik*, 603 F. App'x 61 (2d Cir. 2015) (noting that decisions in at least four other federal courts of appeals make clear that it is unlawful to tase a non-resisting individual who is neither fleeing nor threatening anyone's safety); *see also Cockrell v. City of Cincinnati*, 468 F. App'x 491, 496 (6th Cir. 2012) (collecting cases).

While the factfinder might ultimately conclude that the level of force used was necessary, or at least that a reasonable police officer would believe it to be reasonable, that decision cannot be made at the summary judgment stage. Plaintiff's version of events is not so incredible or in such conflict with other evidence in the record—especially in light of his injuries—as to be so "wholly fanciful" that "'[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made . . . .'" *Jeffreys v. City of New York*, 426 F.3d at 554 (quoting *Schmidt v. Tremmel*, No. 93 CIV. 8588 (JSM), 1995 WL 6250, at *3 (S.D.N.Y. Jan. 6, 1995)); *Moore v. Casselberry*, 584 F. Supp. 2d 580, 585 (W.D.N.Y. 2008) ("[J]ust because the plaintiff's claim is based solely upon his own contradictory and incomplete testimony, that does not automatically entitle the defendants to summary judgment. The evidence must be such that no reasonable juror could believe it."). The credibility determinations necessary to determine which version of the facts is accurate is properly left to the factfinder. *Cameron v. City of New*

*York*, 598 F.3d 50, 61 (2d Cir. 2010).  Accordingly, Defendants are not entitled to summary judgment on their assertion of qualified immunity regarding Plaintiff's excessive force and failure to intervene claims.

## VII. There Are No Disputed Material Facts Regarding Plaintiff's Deliberate Medical Indifference Claim

An arrestee in custody at the time of alleged delay in providing medical attention is protected by the Due Process Clause of the Fourteenth Amendment, which "require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police." *Ricks v. O'Hanlon*, No. 07 CIV. 9849 (WHP), 2010 WL 245550, at *7 (S.D.N.Y. Jan. 19, 2010) (quoting *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983)).  "[T]he official custodian of [the arrestee] may be found liable for violating the [arrestee's] due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need."  *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).

It is undisputed that Plaintiff received medical attention after his arrest on July 16, 2014.  Plaintiff's claim is based on an alleged delay in receiving that treatment.  Pl. Opp. at 17.  Only "a significant delay in medical treatment" provided to an injured arrestee may "ris[e] to the level of constitutional injury."  *Santiago v. City of New York*, No. 98 Civ. 6543 (RPP), 2000 WL 1532950, at *6 (S.D.N.Y. Oct. 17, 2000).  Even crediting Plaintiff's version of the facts, he received medical attention from an EMT within forty-five minutes of his arrest and was hospitalized within ninety minutes of his arrest.  Pl. 56.1 Stmt. ¶¶ 86-87; Yancewicz Dep. Ex. P at 252:14-25, 253:4-8, 254:2-4.  This does not amount to "significant delay" rising to the level of deliberate indifference.  *See Ricks*, 2010 WL 245550, at *8 (finding no deliberate indifference when arrestee received medical treatment from EMS personnel and hospital medical staff within

two to three hours of his arrest); *Basnight v. Rossi,* No. 97 Civ. 1312 (FB), 2003 WL 722810, at *2 (E.D.N.Y. Mar. 4, 2003) (finding no deliberate indifference when arrestee received medical treatment within four hours of his arrest); *Santiago*, 2000 WL 1532950, at *6 (finding no deliberate indifference when plaintiff was hospitalized within an hour and forty-five minutes of complaining of pain).

The Court need not consider whether Plaintiff's injuries created a "serious medical need" because Plaintiff has failed to demonstrate that any of the Defendants acted with deliberate indifference to that need. Defendants' motion for summary judgment is therefore granted with respect to Plaintiff's deliberate indifference claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's deliberate medical indifference claim and DENIED with regard to Plaintiff's unlawful entry, excessive force, and failure to intervene claims. The Clerk of Court is respectfully directed to terminate docket entry 20 and to transfer this case to a judge in White Plains for trial.

**SO ORDERED.**

Date:  August 8, 2016                           VALERIE CAPRONI
New York, New York                              **United States District Judge**